IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o U.S. Attorney's Office<br>601 D Street, NW<br>Washington, DC 20530,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>$12,973,529 in funds on deposit at the U.S. Treasury, Account No. ****8183,<br><br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No.  26-cv-802 |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia, the Money Laundering, Narcotics and Forfeiture Section of the Criminal Division, and the Counterintelligence and Export Control Section of the National Security Division, and brings this verified complaint for forfeiture in a civil action *in rem*, in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure, against $12,973,529 on deposit with the U.S. Treasury in New York, NY ("Defendant Property"), and alleges as follows:

### NATURE OF THE ACTION AND DEFENDANT *IN REM*

1.　　This *in rem* forfeiture action arises out of an investigation of an illicit Iranian oil distribution network led by Mohammad Hossein SHAMKHANI for sanctions violations, money laundering, and related federal offenses.  Specifically, the United States, including the Homeland Security Investigations ("HSI"), the Federal Bureau of Investigation ("FBI"), and the Internal Revenue Service, Criminal Investigations ("IRS-CI"), is investigating SHAMKHANI's

distribution and sale of petroleum products and other commodities using a network of individuals, front companies, shipping companies, and financial institutions, including Wellbred Capital Pte, Ltd.  ("WELLBRED") and Wellbred Trading DMCC ("WELLBRED TRADING").  This action seeks to forfeit the Defendant Property, the transfer of which was intended to promote ongoing violations of U.S. sanctions laws, and which affords SHAMKHANI, WELLBRED, and WELLBRED TRADING a source of influence over entities that have engaged in federal crimes of terrorism, including the National Iranian Oil Company ("NIOC") and the Islamic Revolutionary Guard Corps ("IRGC"), including the IRGC Quds Force ("IRGC-QF").

2.    On July 30, 2025, SHAMKHANI was sanctioned by the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury, which stated that SHAMKHANI is "the son of Ali Shamkhani, a top political advisor to the Supreme Leader of Iran."[1]  Ali Shamkhani was sanctioned by OFAC on January 10, 2020 for his role, at the time, as Secretary of Iran's Supreme National Security Council (SNSC) a body which "determines [Iran's] security and defense policies and coordinates political, intelligence, social, and economic activities in accordance with the Supreme Leader's guidelines."[2]

3.    As part of the July 30, 2025 action, OFAC explained that SHAMKHANI's network "comprises a vast fleet of vessels, ship management firms, and front companies—some posing as legitimate financial services firms—that launder billions in profits from global sales of Iranian and

---

[1]    Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Takes Massive Action Against High-Profile Iranian Network* (July 30, 2025), *available at:* https://home.treasury.gov/news/press-releases/sb0215.

[2]    Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Targets Iran's Billion Dollar Metals Industry and Senior Regime Officials* (Jan. 10, 2020), *available at:* https://home.treasury.gov/news/press-releases/sm870.

Russian crude oil and other petroleum products, most often to buyers in China."[3]  OFAC further stated that "[t]he network employs significant measures to disguise its operations and obfuscate its ties to the Shamkhani family, Iran, and Russia."[4]

4.    The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property that was involved in, and/or is traceable to property that was involved in a violation of the international money laundering statute, 18 U.S.C. § 1956(a)(2)(A), that occurred when WELLBRED, WELLBRED TRADING, and others caused a U.S. financial institution ("U.S. Bank A") to facilitate the payment of U.S. dollars for the benefit of sanctioned individuals and entities of the Islamic Republic of Iran ("Iran"), with the intent to promote a specified unlawful activity, that is, a violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705.

5.    The Defendant Property is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as assets affording a person a source of influence over an individual, entity, or organization engaged in planning or perpetrating any federal crime of terrorism (as defined in section 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, that is, NIOC, the IRGC, and IRGC-QF.

6.    The Defendant Property is approximately $12,973,529 on deposit at the U.S. Treasury, in account number ****8183 and all funds traceable thereto, including but not limited to, any interest accrued.

7.    The Defendant Property is comprised of five separate attempted wire transfers, initiated on or about January 22 and 29, 2026, and February 2, 2026:

---

[3]    *Supra*, note 1.

[4]    *Id*.

a.      A January 22, 2026 $3,500,000 wire transfer from WELLBRED's account at Foreign Financial Institution 1 in Singapore to an account at Foreign Financial Institution 2 in Dubai, United Arab Emirates ("UAE"), in the name of WELLBRED TRADING, WELLBRED's UAE-based subsidiary.  This payment was transferred via U.S. Financial Institution 1 in New York;

b.      A January 22, 2026 $7,500,000 wire transfer from WELLBRED's account at Foreign Financial Institution 3 in Switzerland to an account at Foreign Financial Institution 1 in Singapore also in the name of WELLBRED.  This payment was transferred via U.S. Financial Institution 1 in New York;

c.      A January 22, 2026 $1,500,000 wire transfer from WELLBRED's account at Foreign Financial Institution 4 to an account at Foreign Financial Institution 1 also in the name of WELLBRED.  This payment was transferred via U.S. Financial Institution 1 in New York;

d.      A January 29, 2026 $365,995 wire transfer from WELLBRED's account at Foreign Financial Institution 4 to an account at Foreign Financial Institution 5 in the Netherlands also in the name of WELLBRED.  This payment was transferred via U.S. Financial Institution 2 in New York and U.S. Financial Institution 3 in New York; and

e.      A February 2, 2026 $107,534 wire transfer from WELLBRED's account at Foreign Financial Institution 4 to an account at Foreign Financial Institution 5 in the Netherlands also in the name of WELLBRED.  This payment was transferred via U.S. Financial Institution 2 in New York and U.S. Financial Institution 3 in New York.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a).

9.     Venue is proper in the District of the District of Colombia pursuant to 28 U.S.C. § 1355(b)(1)(A) because an act or omission giving rise to the forfeiture occurred in the District of Columbia.  The Defendant Property was seized pursuant to two seizure warrants: the first signed on or about January 24, 2026 by the Honorable Moxila A. Upadhyaya, 26-sz-006, and the second signed on or about February 9, 2026 by the Honorable G. Michael Harvey, 26-sz-011.  After service of the warrants on U.S. Financial Institution 1 and U.S. Financial Institution 3, respectively, the Defendant Property was transferred to an account controlled by the U.S. government, where it remains.

## LEGAL BACKGROUND

10.     IEEPA authorizes the President of the United States (the "President") to impose economic sanctions in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.  Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving goods from the United States.

### A.     SHAMKHANI Designations

11.     On January 10, 2020, the President signed Executive Order 13902, which authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to impose blocking sanctions on individuals and entities operating in certain sectors of the Iranian economy.  On October 11, 2024, the Secretary of the Treasury determined that individuals and entities operating in the petroleum and petrochemical sectors of the Iranian economy should be subject to such sanctions.

12.     On July 30, 2025, OFAC designated SHAMKHANI, over 50 individuals and entities, and more than 50 vessels "that are part of the vast shipping empire controlled by"

SHAMKHANI.  According to OFAC, SHAMKHANI "leverages corruption through his father's political influence at the highest levels of the Iranian regime to build and operate a massive fleet of tankers and containerships.  This network transports oil and petroleum products from Iran and Russia, as well as other cargo, to buyers around the world, generating tens of billions of dollars in profit."[5]

13.    As a result of these designations, U.S. persons (including U.S. financial institutions) are broadly prohibited from engaging in dealings, directly or indirectly, with or for the benefit of SHAMKHANI.

**B.    Iranian Transactions and Sanctions Regulations**

14.    Beginning with Executive Order 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

15.    On March 15 and May 6, 1995, the President issued Executive Orders 12957 and 12959, prohibiting, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order 13059 clarifying the previous orders.  These Executive Orders authorized the Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.

---

[5]    *Id*.

16.     The ITSR broadly prohibits U.S. persons and individuals or entities otherwise subject to U.S. jurisdiction from engaging in dealings involving Iran or the Government of Iran, absent specific or general authorization from OFAC, which is located in the District of Columbia. Among other restrictions, the ITSR provides that:

   a.     Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited, *see* 31 C.F.R. § 560.203;

   b.     The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology, or services (including financial services) to Iran or the Government of Iran is prohibited, *see* 31 C.F.R. § 560.204; and

   c.     No U.S. person, wherever located, may engage in any transaction or dealing in or related to: (1) goods or services of Iranian origin or owned or controlled by the Government of Iran, or (2) goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran, *see* 31 C.F.R. § 560.206.

17.     Services of Iranian origin include: (a) services by a person residing in Iran; and (b) services performed outside Iran by a citizen, national, or permanent resident of Iran who is ordinarily resident in Iran, or by an entity organized under the laws of Iran or any jurisdiction within Iran.  *See* 31 C.F.R. § 560.306.  The ITSR further provides that the prohibition on the exportation, reexportation, sale or supply of services contained in 31 C.F.R. § 560.204 applies to services performed on behalf of a person in Iran or the Government of Iran or where the benefit of such services is received in Iran, if such services are performed either in the United States, or

outside the United States by an individual or entity subject to U.S. jurisdiction.  *See* 31 C.F.R. § 560.410.

## FACTS GIVING RISE TO FORFEITURE

### A.    Government of Iran

18.    On January 19, 1984, the United States designated Iran as a state sponsor of terrorism.[6]  In 2023, the State Department concluded that "Iran remained the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities in the United States and globally," and found that "Iranian-aligned militia groups (IAMG) in Iraq and Syria conducted repeated attacks with unmanned aircraft systems against U.S. forces in the region in attempts to compel their withdrawal."[7]  The State Department further found that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region," and that "[t]he IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad."[8]  To date, the United States has not delisted Iran as a state sponsor of terrorism.[9]

### B.    Iranian Oil Industry

19.    Under the constitution of Iran, the Iranian government owns and controls the petroleum resources of the country.  Article 44 provides that the economy of Iran will consist of three sectors, "state, cooperative, and private," and the state shall control, own, and administer "all large-scale and mother industries," including "foreign trade, major minerals, banking, insurance,

---

[6]    U.S. DEPARTMENT OF STATE, *Country Reports on Terrorism 2023: available at*: https://www.state.gov/reports/country-reports-on-terrorism-2023.

[7]    *Id.*

[8]    *Id.*

[9]    U.S. DEPARTMENT OF STATE, *State Sponsors of Terrorism*, *available at*: https://www.state.gov/state-sponsors-of-terrorism

[and] power generation." Article 45 of the constitution provides, in part, that mineral deposits are part of the "public wealth and property," which are "at the disposal of the Islamic government for it to utilize in accordance with the public interest."

20.    Article 2 of Iran's Oil Law (Sep. 30, 1987) provides:

> The country's oil resources are part of the Anfal and public wealth, and according to Article 45 of the Constitution, is at the disposal of the Islamic government, and all facilities, equipment, assets and investments that have been or will be made by the Ministry of Oil and subsidiaries at home and abroad will belong to the Iranian people and to the Islamic government. The exercise of sovereignty and ownership of oil resources and facilities belongs to the Islamic Government, which according to the provisions and powers enumerated in this law, it is the responsibility of the Ministry of Oil to act in accordance with the general principles and plans of the country.

### 1.    Ministry of Petroleum

21.    According to the Iranian Ministry of Petroleum's website, the ministry "is a state-run organ affiliated with the Executive branch of government" that was established in 1979. The ministry reports that it "is tasked with exercising the principle of Iran's ownership of and national sovereignty over oil and gas resources as well as separating governance from administrative tasks in the development of oil and gas industry."

22.    The Iranian Ministry of Petroleum ("MOP") exercises its authority over the petroleum industry through four subsidiaries: NIOC, the National Iranian Gas Company, the National Iranian Oil Refining and Distribution Company, and the National Petrochemical Company. Through these subsidiaries, the MOP "supervises exploration, extraction, marketing and selling of crude oil, natural gas and petroleum products in the country."

23.     On October 26, 2020, OFAC designated the MOP under Executive Order 13224 for providing financial support to the IRGC-QF.[10]   OFAC found that "[t]he Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme."[11]

### 2.     National Iranian Oil Company

24.     As noted above, NIOC is the national oil company of Iran and a subsidiary of the MOP.  NIOC describes itself as "one of the largest oil firms in the world with huge hydrocarbon reserves."  NIOC reports that it is "responsible for organizing and policy-making activities of the oil industry, including exploration, drilling, production, research and development, as well as oil and gas exports."

25.     On September 24, 2012, the U.S. Department of the Treasury reported to Congress that it had determined that NIOC was an agent or affiliate of the IRGC. On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF."[12] OFAC noted that "NIOC, overseen by the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in

---

[10]     Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, (Oct.  26, 2020), *available at*: https://home.treasury.gov/news/press-releases/sm1165.

[11]     *Id.*

[12]     *Id.*

Iran."[13] According to OFAC, the distribution of NIOC oil "helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies."[14]

### 3. Persian Gulf Petrochemical Industries Company

26.    On June 7, 2019, OFAC took action against Persian Gulf Petrochemical Industries Company ("PGPIC") for providing financial support to Khatam al-Anbiya Construction Headquarters, which OFAC called "the engineering conglomerate of the [IRGC]."[15] At the time, OFAC identified PGPIC as "Iran's largest and most profitable petrochemical holding group" with a group of subsidiary petrochemical companies that held "40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports."[16]

### C.    IRGC and IRGC-QF

27.    The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system.    The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.

28.    On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13224, which is "aimed at freezing the assets of terrorists and their supporters."[17]  In part, OFAC found that "[t]he Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka

---

[13]    *Id.*

[14]    Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries*, (Jan.  23, 2020), *available at*: https://home.treasury.gov/news/press-releases/sm885.

[15]    Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Sanctions Iran's Largest Petrochemical Holding Group and Vast Network of Subsidiaries and Sales Agents*, (June 7, 2019), *available at*: https://home.treasury.gov/news/press-releases/sm703.

[16]    *Id.*

[17]    Press Release, U.S. DEPARTMENT OF THE TREASURY, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct.  25, 2007), *available at*: https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm

Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)."[18] On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF.[19]

29.    On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189).  The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism."

30.    Also on April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF.  That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign."  On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA.

31.    The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking."[20] According to OFAC, "[t]he IRGC and its major holdings . . . have a dominant presence

---

[18]    *Id.*

[19]    Press Release, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority* (Oct.  13, 2007), *available at*: https:// https://home.treasury.gov/news/press-releases/sm0177

[20]    Press Release, *Treasury Submits Report To Congress On NIOC And NITC* (Sept. 24, 2012), *available at*: https://home.treasury.gov/news/press-releases/tg1718

in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries."[21]

32.     The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil.  Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries . . . to obfuscate its involvement in selling Iranian oil," and that "[t]he IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies."[22] The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC."

33.     On January 23, 2020, OFAC described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") and its terrorist proxies."[23] Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East."[24]

34.     The IRGC generates substantial revenues from the sale of petroleum products.  For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed

---

[21]     Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Sanctions Iran's Largest Petrochemical Holding Group and Vast Network of Subsidiaries and Sales Agents*, (June 7, 2019), *available at*: https://home.treasury.gov/news/press-releases/sm703.

[22]     Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Submits Report To Congress On NIOC And NITC* (Sept. 24, 2012), *available at*: https://home.treasury.gov/news/press-releases/tg1718

[23]     Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries*, (Jan. 23, 2020), *available at*: https://home.treasury.gov/news/press-releases/sm885.

[24]     *Id.*

more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime.  These shipments, taken collectively, sold for more than half a billion dollars.  The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars."[25]

35.    OFAC has stated that crude oil and condensate sold by the IRGC-QF originates with NIOC, and that the IRGC-QF relies on people embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things. Furthermore, National Iranian Tanker Company ("NITC") vessels have been used in IRGC-QF-run operations.[26]

36.    The IRGC uses the proceeds from the distribution of petroleum products to fund its terror activities.  OFAC has found that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East," and that "[t]he profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad."[27] The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people."

---

[25]    Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies*, (Sept. 4, 2019), *available at*: https://home.treasury.gov/news/press-releases/sm767.

[26]    *Id.*

[27]    Press Release, U.S. DEPARTMENT OF THE TREASURY, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries*, (Jan. 23, 2020), *available at*: https://home.treasury.gov/news/press-releases/sm885.

37.     Connections between Iran's petroleum sector and the IRGC-QF's terrorist activities remain strong.  For example, the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") stated in June 2025 that "Iran's oil and petroleum exports remain a major source of revenue for the regime, and the main source of revenue for its armed forces and terrorist partners and proxies.  Most of Iran's oil is sold by [NIOC], which is responsible for the exploration, refining, and export of oil and petroleum products in Iran."[28]  FinCEN's June 2025 public advisory stated that "Iran's budget allots billions of dollars' worth of Iranian oil to Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), the Iranian Armed Forces General Staff ("AFGS"), and the [IRGC-QF] for sale on the international market in order to supplement their budgets," and that the IRGC-QF works "in conjunction with terrorist partner and proxy groups such as the Houthis and Hizaballah [to] smuggle oil to international buyers and use the proceeds to fund weapons development and terrorist activity in the region."[29] FinCEN advised that Iran "typically uses a fleet of old and poorly maintained vessels sometimes referred to as the 'shadow fleet,' 'ghost fleet,' or 'dark fleet'" to conduct these transactions, and that these vessels "are often owned and managed by operating or shipping companies in countries outside Iran, mostly in the United Arab Emirates ("UAE") or Southeast Asia."[30] Iranian-linked "front companies operating in countries outside Iran … lease vessels to hide [the Iranian regime's] involvement and to make payments for services required by ships during their voyages, like bunkering, supplies, insurance, and short-term

---

[28]     FinCEN Advisory, FINANCIAL CRIMES ENFORCEMENT NETWORK, FinCEN Advisory on the Iranian Regime's Illicit Oil Smuggling Activities, Shadow Banking Networks, and Weapons Procurement Efforts, (June 6, 2025), *available at*: https://www.fincen.gov/system/files/FinCEN-Advisory-Illicit-Oil-Smuggling-508.pdf (footnotes omitted).

[29]     *Id.*

[30]     *Id.*

financing."[31] These vessels "may undergo frequent name changes, changes in nominal ownership, or frequent reflagging in different third-country jurisdictions to disguise their illicit activity."[32]

### D.    The SHAMKHANI NETWORK

38.    For more than a decade, SHAMKHANI has operated a network of companies and individuals (the "SHAMKHANI NETWORK") engaged in international shipping of various goods, including Iranian-origin petroleum, as well as other businesses related to the shipping industry.

39.    The SHAMKHANI NETWORK operates with knowledge of, and in violation of, U.S. sanctions that apply to Iranian persons, the Government of Iran, and products of Iranian origin.

40.    The SHAMKHANI NETWORK deals with NIOC, including by sourcing products from NIOC directly or indirectly.  The SHAMKHANI NETWORK also deals with other suppliers in Iran, who—given the structure of Iran's petroleum-products industry—likely also do business with NIOC, the MOP, or other actors associated with the Iranian government.

41.    SHAMKHANI and his associates employ a significant number of support staff in Iran, generate revenue for businesses owned and controlled by the Government of Iran, and operate the companies in the SHAMKHANI NETWORK for the benefit of Iran.

42.    Businesses in the SHAMKHANI NETWORK engage in billions of dollars in transactions every year.  A substantial portion of those transactions are conducted in U.S. dollars.

43.    The SHAMKHANI NETWORK uses services provided by U.S. persons, including U.S.-based correspondent banking services, in violation of U.S. sanctions laws.

---

[31]    *Id.*

[32]    *Id.*

44.     In order to avoid U.S. sanctions, sanctions regimes of other countries, and compliance checks of banks and other service providers, the SHAMKHANI NETWORK uses front companies, nominee ultimate beneficial owners ("UBOs"), fraudulent representations, and other methods to obfuscate the illicit nature of the SHAMKHANI NETWORK.

45.     In other words, the SHAMKHANI NETWORK deploys many of the strategies that FinCEN attributed to so-called "ghost fleet" operators in its June 2025 advisory.

46.     WELLBRED is a Singapore-based company that holds itself out as a "global energy and commodities trading company" that specializes in "oil trading, risk management, shipping, derivatives hedging, and petrochemical waste processing."[33]

47.     WELLBRED TRADING is a wholly-owned subsidiary of WELLBRED, organized under the laws of the Dubai Multi Commodities Centre ("DMCC"), a commodities exchange and free trade zone located in Dubai, UAE.

48.     The SHAMKHANI NETWORK is involved in several business ventures relating to the oil and petroleum industry and international maritime shipping.  These business ventures include commodities trading (usually but not exclusively oil and petroleum products), shipping and vessel management (mainly for oil and petroleum products but also involving agricultural products and other freight), financial services (such as trading in commodities derivatives, both to hedge the network's activities and for profit), and administration of his other businesses.

49.     The SHAMKHANI NETWORK operates through a network of shell companies that are distinct legal entities that appear on the surface to be unrelated but that, in practice, act in a coordinated manner to benefit the SHAMKHANI NETWORK as a whole.  SHAMKHANI NETWORK companies are typically owned and managed by nominal, sham UBOs to obfuscate

---

[33] https://wellbred.com/

17

connections between SHAMKHANI and each company and its UBO or UBOs. Associates of the SHAMKHANI NETWORK change network companies' UBOs as needed to maintain the illusion of separation from the network. The network companies generally observe varying degrees of corporate formalities to maintain the veneer of legitimacy.

50.    SHAMKHANI NETWORK companies often have a Board of Directors comprised of nominees who are presented to the public, customers, financial institutions, governments, and others as managing the SHAMKHANI NETWORK company. However, a "true" Board of Directors comprised of close SHAMKHANI associates, often including SHAMKHANI himself, actually makes key decisions for the SHAMKHANI NETWORK companies.

51.    MILAVOUS GROUP LTD ("MILAVOUS") a/k/a MALVYN GROUP HOLDING LTD ("MALVYN") is a UAE-based company that the SHAMKHANI NETWORK uses as a *de facto* corporate holding or management company for many of the SHAMKHANI NETWORK's associated businesses. Through MALVYN, SHAMKHANI has employed dozens of trusted associates, in Iran, UAE, and elsewhere, and has entrusted them with managing and maintaining his shipping empire. SHAMKHANI migrated many of the functions of MALVYN to MILAVOUS in or about 2023. MILAVOUS was designated by OFAC on July 30, 2025 for its role as an "important component in [SHAMKHANI's] network, assisting [SHAMKHANI] in arranging sales of Iranian oil and gas and laundering the proceeds."[34]

52.    MAX ENERGY FUEL TRADING L.L.C ("MAX ENERGY") was designated by OFAC on July 30, 2025 for having been "involved in transporting oil and laundering the funds for the network," and is one of many companies in the SHAMKHANI NETWORK with a name

---

[34]    *Supra*, note 1.

including the term "Max Energy."[35]    SHAMKHANI has used the brand "MAX ENERGY" for several businesses in his network, primarily those involved with trading oil and gas. SHAMKHANI has used MALVYN and MAX ENERGY in tandem through the years, giving trusted associates roles with both companies.    Generally, SHAMKHANI and his associates used MALVYN to manage corporate operations and MAX ENERGY to engage in the trading business key to his network.    In or about 2020, SHAMKHANI believed that the MAX ENERGY brand had become too closely associated with Iran, and so he migrated MAX ENERGY trading operations to Nest Wise Petroleum LLC ("NEST WISE").

53.    NEST WISE, which was designated by OFAC on July 30, 2025, occupied "a similar role to [MILAVOUS], maintaining the appearance of a legitimate trader of oil and gas, while in reality managing much of the network's purchases of Iranian and Russian oil and gas and their subsequent shipment and sale to overseas buyers," according to OFAC.[36]    NEST WISE has conducted several billions of dollars' worth of trades in Iranian and Russian oil, with a large proportion of those trades conducted in U.S. dollars through U.S. financial institutions.

54.    In its July 30 action, OFAC also designated several shipping companies connected to the SHAMKHANI NETWORK, including DRACO BUREN SHIPPING PTE.    LTD. ("DRACO BUREN"), which OFAC described as "one of the myriad shipping companies created to manage the Hossein network's fleet, managing 21 vessels at its peak for Hossein's network, including both containerships and crude oil tankers."[37]    Another shipping company sanctioned in that action was KOBAN SHIPPING L.L.C. ("KOBAN"), which OFAC asserted has "played

---

[35]    *Id*.

[36]    *Id*.

[37]    *Id*.

important roles in the management and operation of the network's fleet of tankers and containerships."[38]

E.    **The Exchange House**

55.    To avoid U.S. sanctions, the SHAMKHANI NETWORK uses dozens of shell companies to obfuscate that it is trafficking in sanctioned Iranian or Russian oil.  SHAMKHANI organizes companies and vessels into color-coded categories—"green," "gray," and "black"—corresponding to their level of risk, or perceived closeness to Iran and Iranian goods.

56.    Entities and vessels that are directly connected to Iran are assigned the "black" category.  "Black" companies are intended to be viewed "as an island" and are instructed not to use certain unsecure email systems.

57.    Entities and vessels that are involved with cargo and vessels that originate from or enter risky zones are categorized as "Gray."  "Gray" companies are not required to have a strict compliance system and are instructed only to do a "soft" know-your-customer ("KYC") check of counterparties.  These companies are required to have "clean" internal accounting records and are instructed to use "B Tier" audit firms.  "Gray" companies are instructed not to use email communication providers based in the United States.  "Gray" companies act as a buffer layer between "black" and "green" companies, with more than one "gray" company being used at times to create additional legal and reputational distance.

58.    Entities and vessels with the fewest links to Iran are categorized as "green."  "Green" companies are required to have nominee shareholders who can pass KYC checks by counterparties and banks.  "Green" companies are also required to have "clean" internal accounting records such that they can be audited by a reputable audit firm.  The purpose of "green"

---

[38]    *Id.*

companies is to allow the SHAMKHANI NETWORK to operate in the open as much as possible to avail itself of the legitimate international banking, shipping, trading and other networks.  The SHAMKHANI NETWORK uses green companies to disguise the source of the SHAMKHANI NETWORK's products and maintain a veneer of legitimacy.  "Green" companies, such as WELLBRED and WELLBRED TRADING, perform an important role in the continued financial and operational success of the SHAMKHANI NETWORK.

59.     The SHAMKHANI NETWORK employs a group of loyal and trusted employees and associates who work at many different SHAMKHANI NETWORK companies.  Given this overlap of personnel, the SHAMKHANI NETWORK enforces a strict discipline with regard to email communications, instructing its people not to use their "green" company email to conduct business for "gray" or "black" layer companies.

60.     The SHAMKHANI NETWORK trades sanctioned products on paper through these layers to disguise the products' origin (and the SHAMKHANI NETWORK's overall connections to Iran), in what the network calls the "exchange house."  This involves creating a "record" of trading for an illicit shipment.  A given shipment of Iranian or Russian oil is sold, according to falsified documents, from a "black" layer company to one or more "gray" layer companies, and then to one or more "green" layer companies before being sold to end customers, which are often legitimate market actors.  All along this "trading chain," SHAMKHANI NETWORK employees create and use falsified documents and make fraudulent representations to banks and counterparties to facilitate the movement of money and illegal products.

### F.    WELLBRED

61.     In or about 2019, SHAMKHANI acquired control of WELLBRED.

62.     The purpose of SHAMKHANI's acquisition of WELLBRED was for the SHAMKHANI NETWORK to maintain a "brand" that was not publicly perceived to be affiliated

with SHAMKHANI or Iran.  SHAMKHANI and his co-conspirators planned to, and did, use WELLBRED to conduct seemingly legitimate trades of oil sourced from Iran and generally to benefit the SHAMKHANI NETWORK, which included the SHAMKHANI NETWORK's participants in Iran and the Iranian government.

63.    SHAMKHANI maintained an organizational chart, dated in or about November 2019, showing WELLBRED situated in the corporate structure of the SHAMKHANI NETWORK as part of the "Smart Group" with other green companies Ocean Leonid Investments Ltd., which was sanctioned by OFAC on July 30, 2025 along with other of its affiliated companies ("OCEAN LEONID"), and DRACO BUREN.  The "Smart Group" was connected to the "Brave Group" which contained MAX ENERGY, KOBAN SHIPPING, and "Max Wise," which was a pre-incorporation name for the company that eventually became NEST WISE.



64.    The "GROUP CEO" in the organizational chart is SHAMKHANI, who was a member of the true Board of Directors of WELLBRED, along with Alireza DERAKHSHAN, and

Mahdiyar MOJTAHEDI, two long-time close associates of SHAMKHANI who have been involved in multiple SHAMKHANI NETWORK companies. DERAKHSHAN was designated in the July 30, 2025 OFAC action and described as "a prominent figure in the shipping portion of Hossein's network."[39]

65.    SHAMKHANI, DERAKHSHAN, and MOJTAHEDI made business decisions for WELLBRED. SHAMKHANI directed that only the general manager of WELLBRED would communicate with the true board of directors.

66.    A document titled "Brand Architecture" and dating to 2019 lists several companies in the SHAMKHANI NETWORK and explicitly states that "WellBred Sing" (*i.e.*, Wellbred Singapore) is "registered in order to keep Iran threat away from our business. This shall be a clean brand in terms of its structure as well as staff working in it. Shall be fully independet [*sic*], clean set up in order to build up future of our trade on it." WELLBRED TRADING is also listed on the document as a "[b]ranch of Wellbred Sing in UAE." MAX ENERGY is listed on the document as the "[f]ace of Trade in UAE and China" and the document notes that the "[m]arket knows that [MAX ENERGY] is connected to Iran." This description of WELLBRED, MAX ENERGY, and the other SHAMKHANI NETWORK companies is consistent with SHAMKHANI's use of "black," "gray," and "green" layer companies. According to the "Brand Architecture" document's metadata, it was last modified by "Hossein Shamkhani."

67.    SHAMKHANI also maintained hand-drawn organizational charts to reflect the relationships of his companies. In the following diagram, from in or about July 2022, SHAMKHANI notes that there is $300 million in equity in MALVYN and $70 million in equity in WELLBRED:

---

[39]    *Supra*, note 1.



68.    In the years since its acquisition, WELLBRED has been used by the SHAMKHANI NETWORK for a variety of purposes.  At times, WELLBRED has been used as a purportedly "clean" company to nominally acquire ownership of another SHAMKHANI NETWORK company to obscure SHAMKHANI's involvement.  In approximately 2021, SHAMKHANI NETWORK associates represented to an audit firm conducting due diligence on OCEAN LEONID that WELLBRED had acquired OCEAN LEONID on approximately February 20, 2020, from a company with a European Ultimate Beneficial Owner ("UBO-1").  The associates represented that in 2021, OCEAN LEONID was sold by WELLBRED to another SHAMKHANI NETWORK company, OENERGY COMMODITIES, which was also purportedly owned by UBO-1.  The purpose of this nominal transfer, in which WELLBRED essentially bought OCEAN LEONID from UBO-1 and sold it back to UBO-1 shortly thereafter, was to create additional layers of purported ownership history, obscuring SHAMKHANI's involvement with OCEAN LEONID.

69.    WELLBRED has also maintained trading relationships with other entities in the SHAMKHANI NETWORK, primarily NEST WISE.  WELLBRED frequently traded with NEST WISE and facilitated other oil trades by NEST WISE, including involving oil from Iran. WELLBRED has engaged in more than $100 million USD worth of transactions with NEST WISE.

70.     The general manager of WELLBRED has negotiated directly with SHAMKHANI to establish and deepen the economic relationship between WELLBRED and NESTWISE.

71.    SHAMKHANI himself has been copied on email chains regarding WELLBRED's dealings with NEST WISE as recently as 2024, including at least one email chain discussing a cargo of Iranian origin.

72.    At other times, WELLBRED acted as a "sleeve" on transactions for SHAMKHANI NETWORK companies, such as NEST WISE.  In a "sleeve" or "credit sleeve" transaction, the sleeve provider, typically WELLBRED in its sleeve transactions with NEST WISE, co-guarantees a commodity transaction by providing additional working capital or collateral for the transaction.

73.    Had they been successful, the three transfers that comprise the Defendant Property would have moved U.S. dollars between accounts controlled by WELLBRED and WELLBRED TRADING, sustaining their ability to further their important role as "green" companies in the SHAMKHANI NETWORK.

### COUNT ONE - FORFEITURE
**(Against Defendant Property; 18 U.S.C. § 981(a)(1)(A))**

74.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 73 above as if fully set forth herein.

75.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A) or any property traceable to such property is subject to forfeiture to the United States.

76.     SHAMKHANI, WELLBRED, WELLBRED TRADING, and their associates caused or intended to cause the transportation, transmission, or transfer of funds from a place in the United States to or through a place outside the United States and/or from a place outside the United States to or through a place in the United States with the intent to promote the carrying on of "specified unlawful activity," to wit: violation of section 206 (relating to penalties) of the International Emergency Economic Powers Act (50 U.S.C. § 1705), as specified in 18 U.S.C. § 1956(c)(7)(D).

77.     The Defendant Property is property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(A), or is property traceable to such property, and, therefore, are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**COUNT TWO - FORFEITURE**
**(Against Defendant Property; 18 U.S.C. § 981(a)(1)(G)(i))**

78.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 73 above as if fully set forth herein.

79.     As noted above, the IRGC and IRGC-QF are foreign terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189.

80.     The IRGC and IRGC-QF have committed numerous terrorism-related offenses identified in 18 U.S.C. § 2332b(g)(5), including the killing and attempts to kill U.S. personnel proscribed by 18 U.S.C. § 1114.

81.     NIOC has engaged in a federal crime of terrorism, that is "having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF," as found in Executive Order 13224 (October 26, 2020).

82.     The Defendant Property represents funds available to support the operation of the SHAMKHANI NETWORK's distribution of products obtained by the SHAMKHANI NETWORK from NIOC, which gives SHAMKHANI, and other persons involved in the SHAMKHANI NETWORK a source of influence over NIOC and the IRGC, including IRGC-QF, within the meaning of 18 U.S.C. § 981(a)(1)(G)(i).

83.     The Defendant Funds are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as assets that afford any person a source of influence over any entity or organization engaged in planning or perpetrating any federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, U.S. citizens or residents, or their property.

84.     WHEREFORE, the plaintiff prays that all persons who reasonably appear to be potential claimants with interests in the Defendant Property be cited to appear herein and answer the complaint; that the Defendant Property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States Marshal dispose of the Defendant Property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

JEANINE FERRIS PIRRO
United States Attorney


 /s/  *Adam P. Barry*
Adam P. Barry
Assistant United States Attorney
Cal. Bar Number 294449
Email: adam.barry@usdoj.gov
Telephone: 202-252-7793

United States Attorney's Office
National Security Section
601 D St.  NW
Washington, D.C. 20530


CHRISTIAN NAUVEL
Acting Chief, Counterintelligence
and Export Control Section

 /s/  *Sean Heiden*
Sean Heiden
Acting Deputy Chief
D.C.  Bar Number 1617636
Email: sean.heiden2@usdoj.gov
Telephone: 202-514-8106

MARGARET A. MOESER
Chief, Money Laundering, Narcotics and
Forfeiture Section


 /s/  *Peter M. Nothstein*
Peter M.  Nothstein
Senior Trial Attorney
D.C.  Bar Number 498178
Email: peter.nothstein@usdoj.gov
Telephone: 202-353-2037

Mark H. Goldberg
Trial Attorney
D.C.  Bar Number 1630378
Email: mark.goldberg2@usdoj.gov
Telephone: (202) 514-2246

Katlin K. O'Brien
Trial Attorney
D.C.  Bar Number 241635
Email: katlin.obrien@usdoj.gov
Telephone: (202) 764-0414

Jonathan C. Lowry
Trial Attorney
N.Y.  Bar Number 6228191
Email: jonathan.lowry@usdoj.gov
Telephone: 202-616-7331

U.S. Department of Justice, Criminal
Division,
Money Laundering, Narcotics, and Forfeiture
Section, Bank Integrity Unit
1400 New York Avenue NW
Washington, D.C. 20530


Attorneys for Plaintiff
UNITED STATES OF AMERICA

### **VERIFICATION**

I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 6th day of March, 2026.

_Cindy R Burnham_
_____
Special Agent Cindy Burnham
Federal Bureau of Investigation


I, Benjamin Brown, a Special Agent with the Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 6th day of March, 2026.

_____
Special Agent Benjamin Brown
Homeland Security Investigations

29